**Lorey Ann DAVIS, Appellee,**

v.

**TRI–STATE MACK DISTRIBUTORS, INC., Appellant.**

**Nos. 91–3574, 92–1123.**

United States Court of Appeals, Eighth Circuit.

Submitted Sept. 14, 1992.

Decided Dec. 8, 1992.

Stephen H. Biller, Memphis, TN, argued, for appellant.

Richard Quiggle, Little Rock, AR, argued, for appellee.

Before RICHARD S. ARNOLD, Chief Judge, HENLEY, Senior Circuit Judge, and FAGG, Circuit Judge.

HENLEY, Senior Circuit Judge.

In Appeal No. 91–3574 Tri–State Mack Distributors, Inc. (Tri–State) appeals from

an adverse judgment entered in the district court in favor of Lorey Ann Davis on her sexual harassment and retaliation claims under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e–2(a)(1) and –3(a), and state-law claim of outrageous conduct. In Appeal No. 92–1123 Tri–State appeals from a judgment of the court awarding Davis expert witness fees based on a retroactive application of the Civil Rights Act of 1991. We affirm the judgment in No. 91–3574 and reverse and remand in No. 92–1123.

In 1986 Tri–State, a truck distributorship, hired Davis as a branch secretary in its Little Rock, Arkansas office. In May of 1988 Davis began working with Butch Hogland, the service manager. About thirty per cent of her time was spent preparing work orders under Hogland's supervision.

Davis' version of the events is as follows. Shortly after she began working with Hogland, he began making unwelcome sexual comments and contact. For example, Hogland would often ask Davis to go to lunch and "get naked" and would sit in her lap. In June or July of 1988, Davis complained to Frank Owings, Davis' immediate supervisor and the branch manager. Davis told Owings that Hogland was "pawing" her and making offensive remarks. Owings called Hogland into his office and Hogland apologized to Davis for his behavior.

Because of surgery, Davis was off work for about a month. On her return, Hogland resumed making advances which were more numerous and "intense." When Davis refused Hogland's invitations to "get naked," Hogland would press up against her. In late October or early November of 1988, Davis again complained to Owings, telling him that Hogland's sexual harassment had caused her physical and emotional stress. After meeting with Owings, Hogland again apologized. Shortly thereafter, Davis took a month-long medical leave of absence. Davis presented expert testimony that her medical problems were the result of the stress resulting from Hogland's behavior. As before, on her return, the harassment continued. Davis found Hogland's behavior even more offensive.

Hogland had fondled her breasts and told her that because of his anatomy he could impregnate her despite his vasectomy.

Because Owings had failed to put a stop to Hogland's behavior, on Friday, January 27, 1989, Davis travelled to the company's headquarters in Memphis, Tennessee to meet with Robert Myers, the comptroller for the company. Davis told Myers that Hogland had harassed her, and that despite her complaints the harassment continued. Myers told Davis he was unaware of her complaints and would investigate. Myers instructed Owings and Hogland to come to Memphis the following Monday, January 30.

Myers testified that at the meeting Owings and Hogland denied Davis' allegations. Myers, however, warned Hogland that if Davis' allegations were corroborated, he would be discharged. He also arranged the work so that Davis would not have direct contact with Hogland on preparing the work orders. On January 31 the company conducted meetings with employees to discuss sexual harassment. Following Davis' allegations, the company formalized a policy on sexual harassment.

At trial, Owings admitted that Davis had complained to him about Hogland, but denied that she had complained about sexual harassment. According to Owings, Davis only complained that Hogland had been critical of her work. Owings testified that if Davis had complained about sexual harassment, he would have reported the complaint to the company headquarters. He, however, acknowledged that at the time of Davis' allegations the company did not have a policy regarding sexual harassment, explaining that the company "never had an occasion to have one."

Hogland denied that he had sexually harassed Davis. He believed that Davis had fabricated the charges because she was angry that he had been critical of her work. He stated that on one occasion he had to remind Davis that, as service manager, he had control over thirty per cent of her salary.

Davis also testified that following her meeting with Myers and filing a charge

with the Equal Employment Opportunity Commission, the company retaliated against her. She testified that although she did not have direct contact with Hogland, he nonetheless had responsibility over her preparation of the work orders and had "nitpicked" her work. She introduced performance evaluations for 1986, 1987, and 1988, in which Owings had rated her performance as outstanding and commented favorably. Among other things, Davis also accused the company of imposing additional requirements for taking medical leave, falsely accusing her of rude behavior towards customers and taking unexcused absences from work. Davis resigned on May 4, 1989.

The case was submitted to the jury on the state-law claim of outrageous conduct. The court instructed the jury that because Hogland was an employee of Tri–State, "intentional conduct on the part of Mr. Hogland is imputed to Tri–State Mack." The jury returned a verdict in favor of Davis against Hogland and Tri–State. It awarded Davis $7,643.68 compensatory damages against Tri–State. In addition, it assessed $50,000.00 punitive damages against Tri–State and $10,000.00 punitive damages against Hogland. On Hogland's motion, the court set aside the punitive damage, holding that Arkansas law prohibited an award of punitive damages in the absence of compensatory damages. *See Bell v. McManus*, 294 Ark. 275, 277–78, 742 S.W.2d 559, 560, *modified on denial of reh.*, 294 Ark. 275, 278–B, 745 S.W.2d 140, 141 (1988).

As to the Title VII claims, the district court found in favor of Davis. The court noted that the evidence was "sharply divergent," but found Davis' evidence more credible. The court was persuaded that Davis was the victim of Hogland's unsolicited and unwelcome sexual advances. The court found that although Tri–State had made some "token efforts" to address the problem, the "company failed to appreciate the extent of the harassment and failed to take proper remedial measures." The court also found that Tri–State had retaliated against Davis, noting that before her complaints Davis had had an excellent work record. The court awarded Davis $10,764.00 in back pay, $4,000.00 in front pay, and prejudgment interest. In addition, the court awarded attorney's fees, which included expert witness fees of $1,600.00 based on a retroactive application of section 113 of the Civil Rights Act of 1991, Pub.L. No. 102–166, § 113, 105 Stat. 1071, 1079 (codified at 42 U.S.C. § 2000e–5(k)).

■ In Appeal No. 91–3574, Tri–State first argues that the district court erred in denying its motion for judgment n.o.v. on the state-law claim of outrageous conduct. Under Arkansas law, to constitute the tort of outrageous conduct, a defendant's conduct has to be "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized society." *Sterling Drug, Inc. v. Oxford*, 294 Ark. 239, 243–44, 743 S.W.2d 380, 382 (1988) (quotation omitted). Tri–State concedes that Arkansas recognizes a claim of outrageous conduct based on sexual harassment. *See Hale v. Ladd*, 308 Ark. 567, 826 S.W.2d 244 (1992). Tri–State also does not contest that Hogland sexually harassed Davis. It, however, argues that because the jury failed to assess compensatory damages against Hogland, it cannot be held liable for Hogland's conduct.

■ Tri–State relies on *National Bank of Commerce v. HCA Health Serv. of Midwest, Inc.*, 304 Ark. 55, 800 S.W.2d 694 (1990). Tri–State's reliance is misplaced. In *National Bank*, the court held that "[w]here the issue of liability is decided in favor of the agent or servant and against the plaintiff, ... the principal or master cannot be vicariously liable." *Id.* at 59, 800 S.W.2d at 697. In this case, however, the jury found in favor of Davis and against Hogland. Although the jury did not assess compensatory damages against Hogland, it awarded $10,000.00 in punitive damages against him. In a similar situation, in *Hale v. Ladd*, 308 Ark. at 570, 826 S.W.2d at 246, the Arkansas Supreme Court remanded a case for a new trial where a jury

awarded punitive damages, but failed to award compensatory damages. The court found that the verdict on compensatory damages was against the weight of the evidence. *Id.* Davis represents that she did not seek a new trial against Hogland because she elected to take the compensatory damage award assessed against Tri–State. We need not speculate whether the jury awarded compensatory damages against Tri–State based on Hogland's conduct as an agent of Tri–State, or, as will be discussed below, based on Tri–State's inaction in failing to remedy the problem, or both. We, however, note that after each meeting with Owings, Hogland's behavior became more offensive, causing Davis greater stress.

■ Tri–State also challenges the district court's findings on Davis' claims of harassment and retaliation under Title VII. As to the harassment claim, Tri–State argues that the district court's finding that it failed to take prompt remedial action was clearly erroneous. Under Title VII, an employer is liable for sexual harassment if the employer "knew or should have known of the harassment and failed to take proper remedial action." *Burns v. McGregor Elec. Indus., Inc.,* 955 F.2d 559, 564 (8th Cir.1992). Tri–State reasons that after Davis complained to Myers, the company was put on notice and took prompt remedial action to stop the harassment. Tri–State's reasoning is flawed. Tri–State first had notice of Hogland's conduct not when Davis complained to Myers, but when she complained to Owings, the branch manager

and Davis' immediate supervisor. *See id.* (company had notice because plaintiff complained to supervisor); *EEOC v. Hacienda Hotel,* 881 F.2d 1504, 1516 (9th Cir.1989) (company had notice where hotel manager and supervisor had actual knowledge of allegations of sexual harassment); *Hall v. Gus Const. Co.,* 842 F.2d 1010, 1015 (8th Cir.1988) (company has notice "if management-level employees knew, or ... should have known" about offensive conduct).[1]

Although Owings denied that Davis had complained about sexual harassment, we believe the district court found otherwise. Because Owings and Hogland denied that Davis had complained about sexual harassment, we have no way of knowing what Owings told Hogland at the meetings. We do know, however, that Davis testified that each time after Hogland met with Owings, his conduct became more offensive. *Compare Steele v. Offshore Shipbuilding, Inc.,* 867 F.2d 1311, 1316 (11th Cir.1989) (fact that harassment ended after remedial action was of "special importance"). If all Owings told Hogland to do was to apologize, that response was insufficient. "Title VII requires more than a mere request to refrain from discriminatory conduct." *Ellison v. Brady,* 924 F.2d 872, 882 (9th Cir.1991). Contrary to Tri–State's suggestion, the law does not require an employer to fire a harasser. *Barrett v. Omaha Nat. Bank,* 726 F.2d 424, 427 (8th Cir.1984). Rather, what an employer must do is to take " 'prompt remedial action reasonably calculated to end the harassment.' " *Id.*

1. Davis suggests that this court need not decide when Tri–State received notice or whether it took prompt remedial action. She asserts that under *Meritor Sav. Bank v. Vinson,* 477 U.S. 57, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986), Tri–State was liable for Hogland's harassment because he was a supervisor. In *Meritor,* the Supreme Court recognized a "hostile work environment" claim arising from sexual harassment by a supervisor, but held that "employers are [not] always automatically liable for sexual harassment by their supervisors." *Id.* at 72, 106 S.Ct. at 2408. The Court, however, stated that the "absence of notice to an employer does not necessarily insulate that employer from liability." *Id.* Declining to formulate a definitive rule on employer liability, the Court directed lower courts to look to common-law agency principles.

Because we agree with the district court that Tri–State failed to take prompt remedial action following notice, we need not decide whether Hogland was a supervisor for purposes of Title VII, *see Kauffman v. Allied Signal, Inc.,* 970 F.2d 178, 183–85 (6th Cir.1992), *petition for cert. filed,* 61 U.S.L.W. 3338 (U.S. Oct. 20, 1992) (No. 92–700); *Hirschfeld v. New Mexico Corrections Dept.,* 916 F.2d 572, 579 (10th Cir.1990), or further discuss theories of employer liability. *See Hall v. Gus Const. Co.,* 842 F.2d 1010, 1014 (8th Cir.1988); *see also Kauffman,* 970 F.2d at 182–84; *Hirschfeld,* 916 F.2d at 576–80. We, however, note that in *Burns v. McGregor,* 955 F.2d at 564, plaintiff alleged harassment by co-workers and the owner of the company, and this court applied the "knew or should have known" standard.

(quoting *Katz v. Dole,* 709 F.2d 251, 256 (4th Cir.1983)).[2] Here, the district court's finding that Tri–State failed to take prompt remedial action is not clearly erroneous.

Although we recognize that the "mere existence of a grievance procedure and a policy against discrimination," does not necessarily "insulate [an employer] from liability[,]" *Meritor Sav. Bank v. Vinson,* 477 U.S. 57, 72, 106 S.Ct. 2399, 2408, 91 L.Ed.2d 49 (1986), if Tri–State had had an effective sexual harassment policy in place, the results of this case may have been different. *See Kauffman v. Allied Signal, Inc.,* 970 F.2d 178, 184 (6th Cir.1992) ("if [employer's] sexual harassment policy had been less flawed, [employer] might not have been liable"), *petition for cert. filed,* 61 U.S.L.W. 3338 (U.S. Oct. 20, 1992) (No. 92–700). More importantly, if Tri–State had such a policy in place, perhaps Hogland would not have engaged in the offending conduct. As stated in the regulations:

> Prevention is the best tool for the elimination of sexual harassment. An employer should take all steps necessary to prevent sexual harassment from occurring, such as affirmatively raising the subject, expressing strong disapproval, developing appropriate sanctions, informing employees of their right to raise and how to raise the issue of harassment under title VII, and developing methods to sensitize all concerned.

29 C.F.R. § 1604.11(f) (1992).

■ We also find no merit to Tri–State's argument that the district court erred in concluding that Tri–State had retaliated against Davis by making her conditions of employment more onerous after she had complained about sexual harassment. *See Valdez v. Mercy Hosp.,* 961 F.2d 1401, 1403 (8th Cir.1992) (findings concerning retaliation subject to clearly erroneous rule).

■ In Appeal No. 92–1123, we, however, agree with Tri–State that the district court erred in awarding Davis expert witness fees under a retroactive application of section 113 of the Civil Rights Act of 1991.

In *Huey v. Sullivan,* 971 F.2d 1362, 1366 n. 5 (8th Cir.1992), this court recently held that section 113 was not to be applied retroactively.

Accordingly, we affirm Appeal No. 91–3574 and reverse and remand Appeal No. 92–1173.

---

2. In *Barrett,* 726 F.2d at 426–27, this court found that an employer took prompt remedial action by fully investigating, disciplining the harasser by placing him on probation for ninety days, and warning him that further misconduct would result in discharge.